

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| **LESLEY CONTI *et al.*, on behalf of herself and all others similarly situated,**<br><br>Plaintiffs,<br><br>v.<br><br>**AMERICAN HONDA MOTOR CO., INC.,**<br><br>Defendant. | **Case No.: CV 19-02160-CJC(GJSx)**<br><br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT [Dkt. 90] and**<br><br>**MOTION FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS**<br><br>**[Dkt. 79]** |

## I.   INTRODUCTION

Plaintiffs initiated this putative class action on March 22, 2019.  (Dkt. 1.)  The action arises out of alleged defects in Defendant American Honda Motor Company Inc.'s Infotainment System featured in some of Defendant's vehicles.  Plaintiffs allege violations of relevant state consumer protection laws and for breach of express and implied warranties.  (Dkt. 50 [Second Amended Complaint, hereinafter "SAC"].)

After the Court denied in part and granted in part Defendant's motion to dismiss, (Dkt. 49), the parties reached a settlement agreement.  The Court preliminarily approved the class settlement on June 4, 2021, finding that the proposed agreement satisfied the requirements of Federal Rule of Civil Procedure 23, and also appointed Defendant to act as Settlement Administrator.  (Dkt. 73 [Order Granting Preliminary Certification of Class Settlement, hereinafter "Prelim. Approval Order"].)  On July 11, 2019, a separate, related case concerning Infotainment System defects in Honda and Acura vehicles was filed before Judge Klausner.  *See Banh v. American Honda Motor Co.*, No. 2:19-cv-05984 (C.D. Cal.).  Defendant produced documents in *Banh* that show overlap between the vehicles at issue in both actions because the technology is similar.  (Matt Decl. ¶¶ 8–10.)  On December 6, 2021, Judge Klausner granted final approval of the class settlement in *Banh*.  *See Banh*, No. 2:19-cv-05984, Dkt. 230.  Now before the Court is Plaintiffs' motion for final approval of the settlement in this action, (Dkt. 90 [hereinafter, "Mot."]), and Plaintiffs' motion for attorneys' fees, costs, and service awards, (Dkt. 79).  For the following reasons, Plaintiffs' motions are **GRANTED**.[1]

---

[1] The Court held a hearing on this matter on January 4, 2022.

## II.   BACKGROUND

### A.   Factual Background

Plaintiffs bring this putative class action against Defendant American Honda Motor Company, Inc., alleging a variety of claims related to purported defects in the Infotainment Systems of their Honda Odyssey, Honda Pilot, and Honda Passport vehicles.  (SAC.)  The proposed settlement class is defined to include "[a]ll current owners and lessees of the 1) 2018 and 2019 Honda Odyssey vehicles Elite, EX, EX-L, EX-LNR and Touring trim levels; 2) 2019 Honda Pilot vehicles with 2EX-LNR, 2TRG, 2TRG 7P, 4Elite, 4EX, 4EX-L, 4EX-LNR, 4TRG and 4TRG 7P trim levels; and 3) 2019 Honda Passport with 2EX-L, 2TRG, 4Elite, 4EX-L, and 4TRG trim levels (each a 'Settlement Class Vehicle'), who reside in, and who purchased or leased their vehicles (other than for purposes of resale or distribution) in the United States, Puerto Rico, and all United States territories, as well as former owners and lessees of Settlement Class Vehicles who submit a Claim.  The Settlement Class also includes all United States military personnel who purchased a Settlement Class Vehicle during military duty, subject to the exclusions set forth in paragraph 2.2. of the Settlement Agreement."  (Dkt. 90-1 [Settlement Agreement and Release, hereinafter "Settlement Agreement"] ¶ 2.1.)

The Infotainment System consists of multiple LCD screens and at least one touch screen.  (SAC ¶ 3.)  It controls the vehicles' safety, navigation, communications, entertainment, and climate control features.  (*Id.* ¶ 5.)  Plaintiffs generally allege that their vehicles' ("Class Vehicles") Infotainment Systems frequently freeze and crash.  (*Id.* ¶¶ 6–7.)  Because the Infotainment System controls so many features, these malfunctions cause "a wide range of problems."  (*Id.* ¶ 308.)  Plaintiffs allege that Defendant knew about these defects before the vehicles were sold and fraudulently concealed or

misrepresented these defects.  (*Id.* ¶¶ 8–10.)  Plaintiffs further allege that Defendant has failed to remedy the defects as required by its written warranties.  (*Id.*)

Plaintiffs are individuals who purchased or leased 2018 or 2019 Honda Odyssey, 2019 Honda Pilot, or 2019 Honda Passport vehicles.  (*Id.* ¶ 1.)  Plaintiffs made their purchases in nineteen different states: Alabama, Arizona, Colorado, Connecticut, Florida, Georgia, Illinois, Kansas, Kentucky, Maryland, Massachusetts, Missouri, Ohio, Oklahoma, South Carolina, Tennessee, Texas, Virginia, and Washington.  (*See generally id.*)  Plaintiffs bring their claims on behalf of a nationwide class and nineteen state-specific subclasses, representing the nineteen states where Plaintiffs purchased their vehicles.  (*Id.* ¶ 328.)  The nationwide class asserts claims for breach of both express warranty and implied warranty under the Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*  (*Id.* ¶¶ 337–71.)  The state subclasses generally assert claims for (1) breach of express warranty, (2) breach of implied warranty, and (3) violations of a state consumer protection statute.  (*See id.* ¶¶ 372–1006.)

On July 11, 2019, a separate, related case concerning infotainment system defects in Honda and Acura vehicles was filed before Judge Klausner.  *See Banh v. American Honda Motor Co.*, No. 2:19-cv-05984 (C.D. Cal.).  While discovery was ongoing in both cases, the parties conducted three formal mediation sessions before the Honorable Dickran M. Tevrizian (Ret.).  (Dkt. 90-4 [Declaration of Sean Matt in Support of Final Settlement, hereinafter "Matt Settlement Decl."] ¶ 11; Matt Settlement Decl. Ex. A [Declaration of Hon. Dickran Tevrizian (Ret.), hereinafter "Tevrizian Decl."] ¶¶ 5–6.)  In October 2021, following the conclusion of discovery in *Banh*, the parties entered into a settlement agreement in this case.  (*Id.*; Matt Settlement Decl. Ex. 2 [Settlement Agreement and Release].)

**B.   Settlement Terms**

The significant Settlement benefits are multi-faceted and include:

- ***Extended Warranty***.  Valued at approximately $33,766,000, (Dkt. 90-2 [Redacted Declaration of Actuary Lee M. Bowron, hereinafter "Bowron Decl."] ¶ 8), Defendant will extend the Settlement Class Vehicles' New Vehicle Limited Warranty ("NVLW") to cover qualified Infotainment System repairs.  The extension will add an additional two years or 24,000 miles to the original three years or 36,000 miles NVLW, for a total amount of warranty coverage of five years or 60,000 miles from the original purchase or lease date.  (Settlement Agreement ¶¶ 3.8-3.15.)  The benefit applies automatically to Class Members.

- ***Independent Review of Countermeasures***.  The parties jointly retained an independent engineering expert to validate that the methods the Settlement Agreement employs to address the defects in the Infotainment System are robust and appropriate.  (Settlement Agreement ¶ 7.6.)  The expert retained, Eldon Leaphart, provides that "it is [his] opinion that Honda and the proposed settlement has effectively addressed customer issues related to the Honda Settlement Class Vehicle Infotainment Systems.  Continued execution of processes established by Honda to ensure resolution of Infotainment System issue going forward is recommended."  (Dkt. 92-1 [Declaration of Eldon Leaphart, hereinafter "Leaphart Decl."] ¶ 23.)

- ***Ongoing Software Updates***.  Defendant will, in good faith, support the Settlement Class Vehicles by continuing to research, develop, and offer software updates to address identified Infotainment System problems for a period of no less than the Settlement Class Vehicles' Extended Warranty period.  (*Id.*¶¶ 3.11.)

- ***Dealership Assistance and Assessment Program***.  Through the Dealership Assistance and Assessment Program ("DAAP"), Defendant will direct its authorized dealerships and their technicians to undergo additional training and implement additional service strategies to resolve problems.  Technicians will be trained to make software and/or hardware repairs for known Infotainment System problems, even if the specific symptom described by the Settlement Class Member, which had previously plagued Class Members, does not manifest at the time of the dealership visit.  (*Id.* ¶¶ 3.6-3.7.)

- ***Infotainment System Online Resource.*** Defendant will create, maintain, and update for at least 24 months after the Effective Date an Infotainment System Online Resource that will include (a) a list of potential Infotainment System-related issues, that, when selected, will open a drop-down menu to offer potential solutions to the problem such as updating the vehicle's or phone's software or presenting the vehicle at a dealership for an assessment or repair; (b) provide information related to the Infotainment Systems that Settlement Class Members can review; (c) provide a means by which Settlement Class Members can report to Defendant issues or symptoms they believe to be attributable to the Infotainment System; and (d) post relevant recall notices, Service Bulletins, and Over-the-Air updates relating to the Infotainment System. (*Id.* ¶¶ 3.2-3.5.)

- ***Delayed Warranty Repair Service Benefit.*** If Settlement Class Members made more than one visit to an authorized Honda dealership for Infotainment System issues that were not adequately repaired before the Notice Date, they will be eligible to receive two free years of HondaLink Security Service,[2] a $178 value, provided that the visits appear in Defendant's warranty database and the second visit was not the result of a recall or product update. If a Class Member made a delayed warranty repair visit prior to the Notice Date and they currently own or lease an EX or EX-L trim for either the 2018-2019 Odyssey vehicles, 2019 Honda Pilot vehicles, or 2019 Honda Passport vehicles, they will be eligible to receive one year of Sirius XM Select radio (a $204 value). (*Id.* ¶¶ 3.16-3.17, 3.22-3.24.)

- ***Compensation for Certain Costs Related to Delayed Warranty Claims.*** Those that file Claim Forms may also seek reimbursement for (a) qualifying transportation costs incurred if the Settlement Class Member returned a Settlement Class Vehicle more than once to a dealership to repair Infotainment System Symptoms, and/or (b) qualifying battery recharging costs incurred because of a car battery that drained because the Infotainment System did not turn off when it should have. (*Id.* ¶¶ 3.25-3.28.)

---

[2] The Parties represent that the HondaLink Security Service app allows vehicle owners to connect their vehicle to their smartphone. This app also allows for "Automatic Collision Notification," in which a live agent will reach out to check on the driver and request that help be sent in the event of a collision; "Emergency Call Function," in which a live agent will request that help be sent in the event of an emergency; and "Enhanced Roadside Assistance," which allows the driver to summon towing and repair services using a button in their vehicle. (Mot. at 5 n.2.)

- ***Attorneys' Fees, Costs, and Service Awards***.  The Settlement Agreement specified that Defendant would pay Class Counsel's reasonable attorneys' fees and expense reimbursement in an amount consistent with the terms of the Settlement Agreement and upon Court approval.  (*Id.* ¶¶ 5.3-5.7.)  In a separately filed motion, Class counsel sought $972,200.00 for attorneys' fees, $28,845.45 for expense reimbursement, and $50,000.00 for service awards.  (Dkt. 79 [Motion for Attorney's Fees, Costs, and Service Awards, hereinafter "Mot. for Attorney's Fees"].)  Since filing that motion, Defendant has agreed to pay $637,659.55 in attorneys' fees; $28,845.45 in expense reimbursement, and $50,000 in service awards.  (Dkt. 93 [Stipulation and Notice of Defendant's Non-Opposition to Award of Attorneys' Fees, Expenses, and Service Awards.] at 1.)  The service awards will be paid as a $10,000 single award to Lesley and Tom Conti, the original plaintiffs, and $2,000 awards for all other named Plaintiffs, with married Plaintiffs receiving a single award per couple.  (*Id.* at 2.)

- ***Release.***  In exchange for these benefits, all Settlement Class Members who do not opt-out of the Settlement Class will be subject to a release of their claims against Defendant related to Infotainment Systems and Infotainment System Symptoms, as asserted, or as could have been asserted, in the litigation or any other proceedings.  (Settlement Agreement ¶¶ 6.1-6.6.)

### C.     Settlement Notice, Opt-Outs, and Objections

Defendant has paid for and provided Class Notice by first class mail (and electronic mail to Settlement Class Members, where possible).  (Settlement Agreement ¶¶ 4.1-4.12.)  On December 21, 2021, Defendant submitted a declaration detailing the administration of notice to the Class.  (Dkt. 96 [Supplemental Declaration of Settlement Administrator Representative Aaron Goldberg Regarding Settlement Administration Activities, hereinafter "Goldberg Decl."].)  As of December 20, 2021, AHM received a total of 3,248 claim forms.  (*Id.* ¶ 4.)  The Class Notice informed Settlement Class Members that any requests for exclusion must be made in writing and postmarked no later than November 19, 2021.  (*Id.* ¶ 5.)  As of December 20, 2021, the Settlement Administrator received 153 timely opt-out requests from Settlement Class Members.  (*Id.* ¶ 6.)  A total of 4 written objections were timely submitted as of the same date.  (*Id.* ¶ 11.)

## III.   LEGAL STANDARD

In analyzing a motion for final approval of a class settlement agreement, the Court must evaluate whether the proposed class may be certified for the purposes of settlement and whether the settlement terms are appropriate under Federal Rule of Civil Procedure 23.

## A. Class Certification Requirements

When a plaintiff seeks conditional class certification for purposes of settlement, the Court must ensure that the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b) are met. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Staton v. Boeing Co.*, 327 F.3d 938, 952–53 (9th Cir. 2003). Under Rule 23(a), the plaintiff must show the class is sufficiently numerous, that there are questions of law or fact common to the class, that the claims or defenses of the representative parties are typical of those of the class, and that the representative parties will fairly and adequately protect the class's interests. Under Rule 23(b), the plaintiff must show that the action falls within one of the three authorized "types" of classes. Here, Plaintiffs seek certification pursuant to Rule 23(b)(3). Rule 23(b)(3) allows certification where (1) questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### B.      Class Settlement Requirements

Approval of class action settlements is governed by Federal Rule of Civil Procedure 23(e).  A district court may approve class action settlements only when they are "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  The Rule requires courts to consider whether "(A) the class representatives and class counsel have adequately represented the class[,] (B) the proposal was negotiated at arm's length[,] (C) the relief provided for the class is adequate[,] and (D) the proposal treats class members equitably relative to each other."  *Id.* 23(e)(2)(A–D).  In determining whether the class's relief is "adequate," courts must analyze "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)."  *Id.* 23(e)(2)(C).

"[W]hether a proposed settlement comports with Rule 23(e)(2) is [also] guided by the '*Churchill* factors,'"—which encompass some of the factors enumerated in Rule 23(e)—"viz., '(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement.'"[3]  *Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021) (*quoting In re Bluetooth Headset Prods. Liab.*, 654 F.3d 935, 946 (9th Cir. 2011)); *see also Churchill Vill. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004).  "Only when the district court 'explore[s] these factors comprehensively' can the settlement award 'survive appellate

---

[3] The *Churchill* factors are also known as the *Hanlon* factors and the *Staton* factors.  *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003).

review.'" *Id.* (quoting *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000)); *see also* Fed. R. Civ. P. 23(e)(2) Adv. Cmt. Note to 2018 Amendment (the factors identified in 23(e)(2) do not "displace" existing factors, but instead "focus the court and the lawyers on the core concerns of procedure and substance").

The Court's inquiry does not end there.  When, as in this case, "a settlement agreement is negotiated *prior* to formal class certification," the settlement "must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d at 946.  Courts must be wary of "subtle signs" of collusion such as "(1) when counsel receive a disproportionate distribution of the settlement; (2) when the parties negotiate a 'clear sailing' arrangement (*i.e.*, an arrangement where defendant will not object to a certain fee request by class counsel); and (3) when the parties create a reverter that returns unclaimed [funds] to the defendant." *Roes, 1 2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 (9th Cir. 2019).  If, however, there are no subtle signs of collusion, "courts should [not] unnecessarily meddle in class settlements negotiated by the parties[.]" *Briseno v. Henderson*, 998 F.3d 1014, 1027 (9th Cir. 2021); *see Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003) ("Judicial review [] takes place in the shadow of the reality that rejection of a settlement creates not only delay but also a state of uncertainty on all sides, with whatever gains were potentially achieved for the putative class put at risk.").

## IV.   DISCUSSION

To determine whether final approval of a class settlement agreement is appropriate, the Court first reviews the requirements for class certification and then analyzes whether the proposed agreement is fair, reasonable, and adequate pursuant to Federal Rule of Civil Procedure 23(e).

## A. Final Certification of a Settlement Class is Appropriate

### 1.    Plaintiffs Satisfy the Requirements of Rule 23(a)

As explained in the Court's order granting preliminary approval of the settlement, Plaintiffs satisfy Federal Rule of Civil Procedure 23(a)'s prerequisites of numerosity, commonality, typicality, and adequacy of representation.  Fed. R. Civ. P. 23(a).

### a) Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." "No exact numerical cut-off is required; rather, the specific facts of each case must be considered."  *In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 634 (C.D. Cal. 2009) (citing *Gen. Tel. Co. of Nw., Inc. v. E.E.O.C.*, 446 U.S. 318, 330 (1980)).  "As a general matter, courts have found that numerosity is satisfied when class size exceeds 40 members."  *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 602–03 (C.D. Cal. 2015); *see Tait v. BSH Home Appliances Corp.,* 289 F.R.D. 466, 473–74 (C.D. Cal. 2012).  Here, while the exact number of class members is unknown, numerosity is satisfied because Defendant sold or leased approximately 450,000 class vehicles across the United States.

**b) Common Questions of Law and Fact**

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." The plaintiff must "demonstrate that the class members 'have suffered the same injury,'" which "does not mean merely that they have all suffered a violation of the same provision of law." *Wal Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). Rather, the plaintiff's claim must depend on a "common contention" that is capable of class-wide resolution. *Id.* This means "that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*

Plaintiffs allege that the Class Vehicles contain defective Infotainment Systems and that Defendant failed to both disclose the defect to consumers and properly remedy the defect. (*See* SAC ¶¶ 3–10.) Resolution of the Class's claims therefore presents common questions including: (1) whether Defendant's Infotainment Systems were defective, (2) whether Defendant knew about the defect, (3) whether Defendant concealed the defect, and (4) whether the defect was covered by Defendant's express or implied warranties. (*See id*. ¶ 332.) Those questions are central to each Class Member's claims and their resolution will help determine, "in one stroke," whether Defendant violated the law. *See Falcon*, 457 U.S. at 157.

### c) Typicality

Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Representative claims are "typical" if they are "reasonably coextensive with those of the absent class members; they need not be substantially identical."  *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1020 (9th Cir. 1998). Here, Plaintiffs allege that, like every other class member, they purchased or leased class vehicles with defective Infotainment Systems.  (*See* SAC ¶¶ 14–291.)  Accordingly, Plaintiffs' claims are "reasonably coextensive" with those of the class.  *See Hanlon*, 150 F.3d at 1020.

### d) Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  This factor requires (1) a lack of conflicts of interest between the proposed class and the proposed representative plaintiffs, and (2) representation by qualified and competent counsel that will prosecute the action vigorously on behalf of the class.  *Staton*, 327 F.3d at 957. The concern in the context of a class action settlement is that there is no collusion between the defendant, class counsel, and class representatives to pursue their own interests at the expense of the interests of the class.  *Id*. at 958 n.12.

There is no evidence of a conflict of interest between Plaintiffs and the Class. Plaintiffs' claims are identical to those of the Class and they have every incentive to vigorously pursue those claims.  (*See* Dkt. 79-1, Ex. A [Declarations of Named Plaintiffs Ankrom, Beckwith, Bishop, Conley, Conti, Darr, Gill, Hetzler, Hirth, Issa, Lampton, Mohr, Morgan, Patel, Pfeifer, Phan, Rossomando, Szajowitz, Simkin, and Turberville].)

Nor is there any evidence that Plaintiffs' counsel did not adequately represent or protect the interests of the class.  Plaintiffs' attorneys, led by Steve Berman, Sean Matt, and Christopher Pitoun of Hagens Berman Sobol Shapiro LLP and Jeffery Goldenberg and Todd B. Naylor of Goldenberg Schneider, LPA, have extensive experience litigating complex matters, including automobile class actions.  (*See* Dkt. 79-2 [Declaration of Sean Matt in Support of Motion for Attorney's Fees, hereinafter "Matt Fees Decl."] ¶¶ 23–25; Mot. for Attorneys' Fees at 10–11.)  The record indicates that Class Counsel has represented the Class capably.  Since the case's inception, Class Counsel has reviewed more than 20,000 documents in discovery; deposed numerous witnesses; successfully fought back motions to dismiss; worked with engineering experts to reach a settlement agreement addressing the technical issues the Class suffered; navigated difficult settlement and mediation sessions; and met and regularly communicated with Plaintiffs. (Matt Fees Decl. ¶ 3.)  Indeed, Judge Tevrizian noted that based upon his "observations and first-hand experience, [Class] Counsel have substantial expertise in the fields of class actions and complex litigation resolution" such that their "level of advocacy . . . was exceptionally informed, ethical, and effective."  (Tevrizian Decl. ¶¶ 7–9.)

## 2.   Plaintiffs Satisfy Rule 23(b)(3)'s Requirements

In addition to the requirements of Rule 23(a), Plaintiffs must satisfy the requirements of Rule 23(b) to show that the action falls within one of the three authorized "types" of classes.  Here, Plaintiffs seek certification under Rule 23(b)(3).  Rule 23(b)(3) allows certification where (1) questions of law or fact common to the members of the class predominate over any questions affecting only individual members and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**a) Predominance**

Although the predominance requirement overlaps with Rule 23(a)(2)'s commonality requirement, it is a more demanding inquiry. *Hanlon*, 150 F.3d at 1019. The "main concern in the predominance inquiry . . . [is] the balance between individual and common issues." *In re Wells Fargo Home Mortg. Overtime Pay Litig.,* 571 F.3d 953, 959 (9th Cir. 2009). The plaintiff must show that "questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).

Plaintiffs have shown that questions common to the class predominate over any questions affecting only individual members. The central questions in this case include (1) whether Defendant's Infotainment Systems were defective, (2) whether Defendant knew about the defect, (3) whether Defendant concealed the defect, and (4) whether the defect was covered by Defendant's express or implied warranties. These questions can be resolved using common evidence regarding Defendant's Infotainment Systems as well as Defendant's knowledge and representations concerning their infotainment systems.

**b) Superiority**

Class actions certified under Rule 23(b)(3) must also be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Courts consider four nonexclusive factors in evaluating whether a class action is the superior method for adjudicating a plaintiff's claims: (1) the interest of each class member in individually controlling the prosecution or defense of separate actions, (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class, (3) the desirability of concentrating the litigation of the claims in the particular forum, and (4) the difficulties likely to be encountered in the management of a class action. *Id*.

The Court finds that proceeding as a class is superior to other methods of resolving this case.  A class action may be superior "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  A class action may also be superior when "no realistic alternative" to a class action exists. *Id*. at 1234–35.  Given the common issues presented by all Class Members, adjudicating these claims on an individual basis for thousands, if not tens of thousands, of potential plaintiffs would be not only inefficient, but also unrealistic.  Although the Court foresees no management problems from litigating this dispute as a class action, the Supreme Court has held that a district court "need not inquire whether the case, if tried, would present intractable management problems" in a "settlement-only class certification." *Amchem*, 521 U.S. at 620.  Accordingly, Plaintiffs' proposed class is appropriate for certification.

**B.      The Proposed Class Action Settlement is Adequate, Fair, and Reasonable**

Again, a district court may approve class action settlements only when they are "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  The Rule requires courts to consider whether "(A) the class representatives and class counsel have adequately represented the class[,] (B) the proposal was negotiated at arm's length[,] (C) the relief provided for the class is adequate[,] and (D) the proposal treats class members equitably relative to each other."  *Id.* 23(e)(2)(A–D).  In determining whether the Class's relief is "adequate," courts must analyze "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)."  *Id.* 23(e)(2)(C).  Within these inquiries, Courts also evaluate the *Churchill*, otherwise known as the *Hanlon*, factors and consider additional indicators of fairness, such as the experience and views of counsel and the reaction of the class members to the Settlement Agreement.

The proposed Settlement Agreement is adequate, fair, and reasonable.  Given the substantial benefits provided to the Class Members, the significant effort and results achieved by Class Counsel in light of the difficulties and complexities of the case, the overall positive response to the Settlement Agreement from Class Members, and the arm's length, adversarial negotiations between the parties, resulting in Class Counsel seeking a fraction of their lodestar amount in attorneys' fees, having no impact on the relief available to the Class, the Settlement Agreement strikes a balanced approach to resolving claims of Class Members.

**23(e)(2)(A): Adequacy of Class Representatives and Counsel**

Rule 23(e) requires a Court to ensure that in a proposed settlement, "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). Considerations at this stage include "the nature and amount of discovery in this or other cases, or the actual outcomes of other cases," which "may indicate whether counsel negotiating on behalf of the class had an adequate information base." Fed. R. Civ. P. 23(e)(2)(A) & (B) Adv. Cmt. Note to 2018 Amendment. "These considerations overlap with certain [*Churchill*] factors, such as the non-collusive nature of negotiations, the extent of discovery completed, and the stage of proceedings." *In re Extreme Networks, Inc. Sec. Litig.*, 2019 WL 3290770, at *7 (N.D. Cal. July 22, 2019).

As the Court previously noted, "[t]he record indicates that counsel have represented the class capably and adequately" by participating in numerous mediation and settlement negotiations; conducting extensive discovery; hiring and consulting with scientific and damages experts; and defeating motions to dismiss to allow the case to proceed to a point where the Class Members will have relief. *See LaGarde v. Support.com, Inc.*, 2013 WL 1283325, at *7 (N.D. Cal. Mar. 25, 2013) (noting presence of discovery supports conclusion that the plaintiffs were sufficiently informed during negotiations); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459 (affirming final approval where "Class Counsel conducted significant investigation, discovery and research" and "had worked with damages and accounting experts throughout the litigation"). Thus, the parties had a full opportunity to assess the strengths and weaknesses of the claims and make an informed decision about settlement. *See Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) (holding that, regardless of form, the parties need only "sufficient information to make an informed decision about settlement"); *LaGarde*, 2013 WL 1283325, at *7 (holding that parties were sufficiently informed where they "did engage in some motion practice that . . . provid[ing] the parties with a better understanding of the information available to the opposing side").

### 1.      23(e)(2)(B): Arm's Length Negotiation

Under Rule 23(e)(2)(B), the Court considers whether the Settlement was "negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). To analyze this, the Court considers the "conduct of the negotiations." Fed. R. Civ. P. 23(e)(2)(A) & (B) Adv. Cmt. Note to 2018 Amendment. "[T]he involvement of a neutral or court-affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the class interests." *Id*.; *see also Fed. Ins. Co. v. Caldera Med., Inc*., 2016 WL 5921245, at *5 (C.D. Cal. Jan. 25, 2016) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.") (internal quote omitted); *City of Seattle*, 955 F.2d at 1290 ("'[T]he district court must reach a reasoned judgment that the proposed agreement is not the product of fraud or overreaching by, or collusion among, the negotiating parties.'") (quoting *Ficalora v. Lockheed Cal. Co*., 751 F.2d 995, 997 (9th Cir. 1985)). Additionally, the Court may look at "the treatment of any award of attorneys' fees, with respect to both the manner of negotiating the fee award and its terms." Fed. R. Civ. P. 23(e)(2)(A) & (B) Adv. Cmt. Note to 2018 Amendment.

The parties have sufficiently shown that the negotiations were at arm's length. Again, Judge Tevrizian worked extensively with the parties and previously testified that in his view, the Settlement was the product of "arm's length, spirited, prolonged, and difficult" negotiations. (Tevrizian Decl. ¶ 7.) There are also no indications that the parties colluded in any manner. The Settlement Agreement does not have a clear sailing provision nor a reverter. *See Roes, 1 2*, 944 F.3d at 1049. Moreover, the terms of the Settlement are not impacted in any way by the award of attorneys' fees to Class Counsel. (Settlement Agreement ¶ 5.5 [attorneys' fees are to be paid "separate and apart from any relief provided to the Settlement Class"].) In fact, the parties did not begin negotiating attorneys' fees until after all material settlement benefits for the Class were agreed upon.

(Order on Prel. Approval at 14–15; Matt Settlement Decl. ¶ 11.)  As the Court previously noted in its preliminary approval order, "the Settlement expressly contemplates that fee negotiations will be conducted in an adversarial manner."  (*Id.* at 15); *see also Sadowska v. Volkswagen Grp. Of Am.*, 2013 WL 9600948, at *8 (C.D. Cal. Sept. 25, 2013); *Rodriguez v. Farmers ins. Co. of Ariz.*, 2013 WL 12109896, at *5 (C.D. Cal. Aug. 4, 2013).  And the negations were adversarial, with Plaintiffs and Defendant unable to reach a resolution on the appropriate amount of attorneys' fees, causing Plaintiffs to file a separate motion.  (*See* Mot. for Attorneys' Fees.)  This, in turn, produced a stipulation between the parties in which Class Counsel agreed to reduce the amount of fees sought by $334,540.45, indicating spirited and hard negotiations amongst the parties rather than collusion.  (Dkt. 93.)

## 2.   23(e)(2)(C): Adequacy of Relief for the Class

In determining whether the class' relief is "adequate," courts must consider "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)."  *Id.* 23(e)(2)(C).  The Court finds the proposed relief to be adequate.

**a)  23(e)(2)(C)(i): Costs, Risks, and Delay of Trial and Appeal**

Each Class Member will receive a meaningful benefit under the Settlement Agreement.  Although the Settlement does not award monetary compensation to each Class Member, Defendant is obligated to implement programs designed to repair the Class Members' defective Infotainment Systems.  First, Defendant will provide an extended warranty covering infotainment system issues for the entire class, which will add two years or 24,000 miles (whichever occurs first) to Plaintiffs' existing New Vehicle Limited Warranty.  (Settlement ¶ 3.8.)  Any Class Member who incurs out-of-pocket expenses because their original warranty expired prior to the effective date of the extended warranty will be reimbursed for their expense.  (*Id.*)  Second, Defendant will create an Infotainment System Online Resource, a website that offers potential solutions to common issues with the infotainment systems.  (*Id.* ¶ 3.2.)  Third, Defendant will implement the Dealership Assistance and Assessment Program, which will train Defendant's technicians to diagnose and fix common recurring problems with the infotainment systems, even when those issues cannot be replicated.  (*Id.* ¶ 3.6.)  Fourth, class members who made multiple unsuccessful dealership visits to repair their infotainment systems prior to the notice of settlement will be eligible for benefits such as two years of free HondaLink Security (an $89 value per year) or one year of free Sirius XM Select (a $204 value).  (*Id.* ¶¶ 3.16–17.)  Finally, Class Members will be entitled to reimbursement of costs directly resulting from multiple unsuccessful repairs if these costs relate to (1) the cost of recharging a battery drained by a defective Infotainment System or (2) transportation costs to return to a dealership for multiple repairs.  (*Id.* ¶ 3.25.)

The Court finds that these benefits present a fair compromise in light of the risks and expense of continued litigation.  At this point in the case, the parties have a clear view of the strengths and weaknesses of their positions given that Defendant has already filed two motions to dismiss and the Court granted one with respect to several of

Plaintiffs' claims, indicating potential weaknesses in the allegations.  Additionally, Class Members may face significant problems of proof should the case progress to trial.  As Plaintiffs allege in their SAC, some Class Members could not replicate issues that they faced with their Infotainment Systems when they took their Class Vehicles to technicians for repair.  Obviously, Plaintiffs cannot prevail on their claims unless they present substantial evidence showing that the problems complained of do in fact exist.  And even if Plaintiffs could present substantial evidence that the problems do exist, many of them may have some difficulty showing that they suffered damages and the extent of those damages.  Clearly, there is a risk that Plaintiffs would not achieve a better result at trial than the one they are receiving under the Settlement.

### (1) Objections Raised

Before turning to the remaining 23(e)(2)(C) factors, the Court addresses the four objections raised to the Class Settlement.  Two of the objections were filed by individuals who no longer own a Class Vehicle, Mark Fallis, (Dkt. 84), and Kathryn Agnew, (Dkt. 85).  Neither complain about the relief being offered to current owners, but rather seek compensation for the inconvenience they suffered prior to trading in their Class Vehicle.  However, "it is entirely appropriate to structure as part of a settlement a customer support program that applies only to future claims . . . [T]he failure of the parties to include a term to compensate class members for past repairs does not render the proposed settlement unreasonable."  *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs.* & Prod. Liab. Litig., 2013 WL 12327929, at *22 (C.D. Cal. July 24, 2013).  Mr. Fallis and Ms. Agnew may still seek relief under the Agreement.  Although they are

required to file a claim for reimbursement, (Settlement Agreement ¶ 2.1), they may recover for qualifying expenses.

The third objector, John Foster, argues that the Settlement Agreement is defective because Defendant has a policy of "no repair unless problem duplicated" at the dealership.  (Matt Settlement Decl., Ex. A at 1.)  However, the Settlement Agreement explicitly requires Defendant to repair Class Vehicles even if the problem cannot be duplicated at the dealership.  (Settlement Agreement ¶ 3.6).  This change will directly address Mr. Foster's concerns.  Mr. Foster's other concern that the extended warranty should be tacked on to those that purchased a 7-year warranty extension is not unreasonable.  But the Settlement Agreement is the result of multiple rounds of negotiations, extensive discovery, and expansive mediation efforts.  It is also not entirely clear to the Court how many Class Members have purchased the 7-year warranty extension and whether this benefit would make a significant difference to most of the Class.  Indeed, "[s]ettlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon*, 150 F.3d at 1027.

The fourth and final objection was submitted by Kyungsuk (Kai) Song.  (Matt Settlement Decl., Ex. B.)  Mr. Song appears to complain about other malfunctions with his vehicle.  (*Id*. at 1.)  Specifically, Mr. Song submits two pictures of his dashboard, with one picture showing "Emission System Problem" and the other showing "Transmission System Problem."  (*Id*.)  This objection appears to relate to issues other than those involved in this case and provides no ground to question the fairness of the Settlement.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**b) 23(e)(2)(C)(ii): Effectiveness of Any Proposed Method of Distributing Relief to the Class, Including the Method of Processing Class-Member Claims**

Rule 23(e)(2)(c)(ii) requires the court to evaluate whether the methods of distribution and claims processing are effective. As of December 20, 2021, the Settlement Administrator received 3,248 claim forms and 153 timely opt-out requests. (Goldberg Decl. ¶¶ 4, 9.) Though the overall number of claims appears low in comparison to the 450,000 approximate Class Members, the Court notes that Class Members will receive the highest-value benefit, the warranty extension, without having to file a claim. This benefit, valued at approximately $33,766,00, (Bowron Decl. ¶ 8), will be in addition to the Infotainment System Online Resource, also accessible automatically to any member of the class, limiting concerns about the proposed methods of processing class member claims.

There is also no suggestion that the Settlement Administrator's method of notifying the class was ineffective. Defendant compiled a list of vehicle identification numbers ("VINs") for the Settlement Class Members from the Departments of Motor Vehicles and the states and territories covered by the Settlement Agreement. (Dkt. 88 [Declaration of Settlement Administrator Representative Julie Kim Regarding Settlement Administration Activities] ¶ 4.) Those addresses were then run through the National Change of Address database to obtain the most current address information for the Settlement Class Members. (*Id.*) The Settlement Administrator also obtained email addresses of Class Members that previously and voluntarily provided their email addresses to Defendant. (*Id.* ¶ 5.) In total, the Settlement Administrator caused 486,258 Notice Packets to be mailed to Settlement Class Members residing in the United States, Washington, D.C., Puerto Rico, and the U.S. Virgin Islands, in addition to 436,000 e-mails to Settlement Class Members. (*Id.* ¶ 7.) As of December 3, 2021, only 7,609 or

1.7% of the total number of Notice Packets were returned by the U.S. Postal Service.  (*Id.* ¶ 9.)  Additionally, the Settlement Administrator has maintained a website with all of the pertinent information on the Class, including how to file a claim, since June 17, 2021.  The Settlement Administrator also maintains a toll-free telephone number dedicated to the Settlement Agreement with live agent support and pre-recorded FAQs for inquiries concerning the Infotainment System.  (*Id.* ¶¶ 11–15.)

### c) 23(e)(2)(iii): Attorneys' Fees & Expenses

The Court must consider "the terms of any proposed award of attorney's fees" in determining whether the class's relief is adequate.  Fed. R. Civ. P. 23(e)(2)(C)(iii).  When evaluating the fairness of an attorneys' fees award, courts should consider the "subtle signs" of collusion, which include "(1) when counsel receive a disproportionate distribution of the settlement; (2) when the parties negotiate a 'clear sailing' arrangement (*i.e.*, an arrangement where defendant will not object to a certain fee request by class counsel); and (3) when the parties create a reverter that returns unclaimed [funds] to the defendant."  *Roes, 1 2*, 944 F.3d at 1049.  If the Court has determined that the requested attorneys' fees and expenses do not vitiate the adequacy of relief to the class, "Federal Rule of Civil Procedure 23(h) permits the court to award reasonable attorney fees and costs[.]"  *In re HP Printer Firmware Update Litig.*, 2019 WL 2716287, at *2 (N.D. Cal. June 28, 2019) (citing Fed. R. Civ. P. 23(h)).  "Courts in this circuit determine attorney's fees in class actions using either the lodestar method or the percentage-of-recovery method."  *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 570 (9th Cir. 2019) (citing *Hanlon*, 150 F.3d at 1029).  The lodestar method "may prove more convenient" in a case where "valuing the settlement is difficult or impossible."  *Id*. at *47 (citations omitted).

Class Counsel in this case was made up of attorneys, paralegals, and legal assistants from the firms Hagens Berman Sobol Shapiro LLP and Goldenberg Schneider L.P.A.  The Settlement Agreement specified that Defendant would pay Class Counsel's reasonable attorneys' fees and expense reimbursement in an amount consistent with the terms of the Settlement Agreement and as approved by the Court, (*id.* ¶¶5.3-5.7), and in a separately filed motion, Class counsel sought $972,200.00 in attorneys' fees, $28,845.45 for expense reimbursement, and $50,000.00 for service awards.  (Plaintiff's Mot. for Attorneys' Fees.)  Since filing that motion, Defendant has agreed to pay $637,659.55 in attorneys' fees to Class Counsel, $28,845.45 in expense reimbursement, and $50,000 in service awards, representing a more than $300,000 decrease in Class Counsels' fees. (Dkt. 93 at 1.)  The parties propose that the service awards will be paid as a $10,000 single award to Lesley and Tom Conti, the original plaintiffs in this action, and $2,000 awards for all other named Plaintiffs, with married Plaintiffs receiving a single award per couple.  (*Id.* at 2.)

**(1) There is No Evidence of Collusion**

As described above, there is no indication of improper collusion here among the parties.  Though Defendant now agrees to Class Counsel's requested amount, it opposed the higher amount Class Counsel initially requested, resulting in a figure approximately $300,000 less than what Class Counsel initially sought.  Additionally, the Settlement Agreement contains no clear sailing provision nor reverter clause, and the Court's attorneys' fee award in no way impacts the benefits Class Members receive under the

Agreement.  Since the Court finds no evidence of collusion, it turns to whether the amount Class Counsel seeks is reasonable.

### (2) The Lodestar Amount is Reasonable

In total, Class Counsel seeks $637,659.55 in attorneys' fees for approximately 1,673.2 hours of work.  (Dkt. 79 at 9.)  Though Class Counsel asks that the Court use the lodestar method to determine the appropriate award amount, they are transparent that the method they used to evaluate the number of hours billed is atypical.  (Mot. at 8–11.)

Given the substantial overlap between this action and *Banh*, Class Counsel maintains that some of their time and expenses are allocable to both cases.  (Dkt. 79-9 [Declaration of Todd B. Naylor, hereinafter "Naylor Decl."] ¶¶ 8–14.)  However, Class Counsel took care to avoid "double billing" by charging time and expenses to one case or the other, but never both.  (Matt Fees Decl. ¶¶ 20–22); *see Prandini v. National Tea Co.*, 557 F.2d 1015, 109 n.3 (3d Cir. 1977) (where plaintiff sues the same defendant in two separate actions for "nearly identical" claims, "double payment for the same effort should be avoided by some apportionment of the fee between the two cases"); *see also Camarillo v. City of Maywood*, 2015 WL 505886, at *7 (C.D. Cal. Feb. 4, 2015) ("A lawyer who spends four hours of time on behalf of three clients has not earned twelve billable hours . . . The practice of billing several clients for the same time or work product, since it results in the earning of an unreasonable fee, therefore is contrary to the mandate of the Model Rules.").

Specifically, Class Counsel allocated 50% of all time and expenses spent on mediation and settlement to this action and 50% to *Banh*, and allocated 25% of all time spent and expenses incurred on document discovery and deposition of Defendant to this action and 75% to *Banh*.  (Naylor Decl. ¶¶ 16–24; Matt Fees Decl. ¶¶ 20–22.)  Class

Counsel explained that most of the discovery was conducted as part of the *Banh* litigation, but those efforts included materials involving both *Banh* and *Conti* Class Vehicles.  Additionally, the actions were mediated and ultimately settled together. (Naylor Decl. ¶ 17.)

As noted above, the work across both actions was extensive.  Attorneys and staff accomplished the following tasks: (1) investigated the claims; (2) met and communicated regularly with Plaintiffs; (3) researched and drafted the complaint and amended complaint; (4) filed discovery requests and a protective order and issued third-party subpoenas; (5) negotiated the production of extensive Electronically-Stored Information; (6) reviewed and coded more than 20,000 pages of documents; (7) prepared for and participated in fact depositions of Defendant and Defendant-related personnel; (8) retained and consulted with liability and damages experts; (9) researched and responded to Defendant's motions to dismiss; (10) drafted mediation statements and participated in mediation sessions; (11) participated in drafting the Settlement Agreement and class notices; (12) researched and drafted the preliminary approval brief; (13) worked with the independent engineering expert as necessary to provide relevant information related to the litigation and the Infotainment System; (14) coordinated administration of the Settlement (ongoing); and (15) responded to communications from Class Members with questions about the Settlement.  (Matt Fees Decl. ¶ 4.)

Mr. Naylor and Mr. Matt, Class Counsel in both this action and *Banh*, explain in detailed declarations how they arrived at the specific ratio apportionment between the two actions.  (*See* Naylor Decl. ¶¶ 18–21; Matt Fees Decl. ¶¶ 19–23.)  To determine the discovery breakdown, Mr. Naylor identified 50 search terms to locate documents produced in *Banh* that would also pertain to the *Conti* Class Vehicles.  (Naylor Decl. ¶¶ 18, 19.)  The search results indicated that 31.9% of the documents contained one or more of the *Conti* Class Vehicle search terms.  A second search of email threads and attachments showed a 54.3% overlap.  (*Id.* ¶ 20.)  Selecting the more conservative figure

of 31.9%, Mr. Naylor then audited the results, randomly reviewing approximately 40% of the documents identified to confirm that they were applicable to the present action. (*Id.*) This audit confirmed to Mr. Naylor that 86% of the identified documents did apply to the present action. (*Id.*) From there, Mr. Naylor calculated that if 86% of 31.9% of the documents applied to *Conti*, then approximately 27% of the document discovery in *Banh* applied to *Conti*. (*Id.* ¶ 21.) For the sake of simplicity, Mr. Naylor rounded 27% down to 25%. (*Id.*) Mr. Naylor then examined all his firm's bills from *Conti* and *Banh* to try and identify time entries and expenses that were related to document discovery from Defendant. From each entry, he made his best effort to ensure that 75% of the time and expenses were allocated to *Banh* and 25% to this action. (*Id.* ¶¶ 22, 23.) The same was done with respect to time and expenses spent on depositions. (*Id.* ¶ 23.) Mr. Matt did the same. (Matt Decl. ¶¶ 19–22.)

To determine the ratio breakdown between the two actions for time entries and expenses related to mediation and settlement, the calculation was simpler. For each such entry, Mr. Naylor and Mr. Matt allocated 50% of the time and expenses to *Banh* and 50% to *Conti*. (Naylor Decl. ¶ 24; Matt Fees Decl. ¶ 22.) Mr. Naylor acknowledges that determining how to split each reviewed time entry between the two actions involves "an inherent degree of subjectivity to determining that a particular entry relates to document or deposition discovery from Defendant or its related entities" whether the entry "relates to settlement." (Naylor Decl. ¶¶ 23, 24.) But Mr. Naylor warrants that at all times he was acting in good faith, (*id.*), and Mr. Matt affirms that he "ensured no time and expense was double billed—that is, no time and expense was billed to both *Banh* and to *Conti*." (Matt Fees Decl. ¶¶ 21, 22.)

Though the Court is wary of Class Counsel retroactively determining how to allocate time entries between two actions, the Court finds nothing per se unreasonable about the methods Mr. Naylor and Mr. Matt employed here. It is clear from their

declarations that they both took great care not to "double-bill" for the two matters and Class Counsel cites adequate authority showing that apportioning the fees across two actions is appropriate. The Court's initial hesitations at the proposed calculation method are also quelled significantly by the fact that Class Counsel now asks for a fraction of their lodestar amount, more than $300,000 less than what they initially requested.

The rates Class Counsel seeks are also appropriate. As this Court has already noted, Class Counsel in this matter "have extensive experience litigating complex matters, including automobile class actions" and have "represented the class capably." Again, Judge Tevrizian provided a sworn declaration opining that he found Class Counsel to be "highly capable, experienced, and informed," and that based upon his "observations and first-hand experience, [Class] counsel have substantial expertise in the fields of class actions and complex litigation resolutions" such that their "level of advocacy . . . was exceptionally informed, ethical, and effective." (Tevrizian Decl. ¶¶ 7–9.) Considering this experience and the "prevailing market rates in the relevant community," the hourly rates sought by Class Counsel—$225 to $325 for paralegals, $375 to $650 for associates, and $625 to $825 for partners—are warranted. *Gonzalez v. City of Maywood*, 729 F.2d 1196, 1205 (9th Cir. 2013); (Matt Fees Decl. ¶ 14; Naylor Decl. ¶¶ 28–32; Dkt. 79-25 [Declaration of Robert Curtis in Support of Class Counsels' Motion for Attorneys' Fees].) Indeed, the rates Class Counsel seek are consistent with those the Ninth Circuit and numerous Central District judges have approved. *See, e.g., Marshall v. Northrup Grumman Corp.*, 2020 WL 5668935, at *7 (C.D. Cal. Sept. 18, 2020) (approving attorney rates between $490 and $1,060 per hour); *Alikhan v. Goodrich Corp.*, 2020 WL 4919382, at *8 (C.D. Cal. June 25, 2020) (approving rates of up to $950 per hour); *Edwards v. First Am. Corp.*, 2016 WL 8999934, at *5 (C.D. Cal. Oct. 4, 2016) (rates of up to $990 found reasonable).

Other factors indicate that the amount requested is reasonable.  First, Class Counsel achieved a favorable result for the Class despite risky, complex, and expensive litigation, while serving the Class on a contingency basis.  *See Vizcaino*, 290 F.3d at 1048 ("The risks assumed by Class Counsel, particularly the risk of non-payment or reimbursement of costs, is a factor in determining counsel's proper fee award."); *see also In re Toyota*, 2013 WL 12327929, at *32 ("Attorneys are entitled to a larger fee award when their compensation is contingent in nature.").  Second, "[t]he overall result and benefit to the class from the litigation is the most critical factor in granting a fee ward" and was favorable here.  *Graham v. Capital One Bank (USA), N.A.*, 2014 WL 12579806, ay *5 (C.D. Cal. Dec. 8, 2014).  As described above, the Settlement provides meaningful benefits to the Class, that are multi-faceted, substantial, and automatically received.  The most salient benefit, the extension of the warranty, is valued at over $33 million. (Bowron Decl. ¶ 8.)  Given the risk that Plaintiffs could have received much less, this is a substantial win for the Class Members.  Third, only four class members have filed objections, which is relatively small given the overall size of the class.  *See In Re Heritage Bond Litig.*, 2005 WL 1594403, at *21 (C.D. Cal. June 10, 2005) ("The absence of objections or disapproval by class members to Class Counsel's fee request further supports finding the fee request reasonable.").

### (3)     Named Plaintiff Service Awards Are Also Reasonable

The parties have also agreed to provide 21 service awards ranging from $2,000 to $10,000 for named Plaintiffs.  Service awards are typical in class actions, and "are intended to compensate class representatives for work done on behalf of the class, to make up for financial reputational risk undertaken in bringing the action, and sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009).  Class Counsel maintains that each

named Plaintiff expended considerable effort on behalf of the Class by meeting with Class Counsel at the outset of the case; assisting with fact investigation; reviewing the Complaint prior to filing; and consulting with Class Counsel during the litigation and settlement negotiations.  (*See* Dkt. 79-1, Ex. A [Declarations of Named Plaintiffs Ankrom, Beckwith, Bishop, Conley, Conti, Darr, Gill, Hetzler, Hirth, Issa, Lampton, Mohr, Morgan, Patel, Pfeifer, Phan, Rossomando, Szajowitz, Simkin, and Turberville].) Class Counsel seeks a higher award for Plaintiffs Lesley and Tom Conti, the original Plaintiffs in this action.  As set forth in their Declaration, the Contis previously turned down a $3,000 pre-suit settlement offer from Defendant, chose to prosecute this action on behalf of the Class as the original Plaintiffs, and provided substantial input and assistance throughout the action.  (*Id.* [Declaration of Lesley Conti and Tom Conti] at 3–5.)  Class Counsels' request for service awards is therefore appropriate given the amount of time and effort each dedicated to this matter and are in line with awards granted in the Ninth Circuit.  *Pike v. Cty. of San Bernardino*, 2020 WL 1049912, at *6 (C.D. Cal. Jan. 27, 2020) (granting $15,000 service awards "where class representatives devoted great time and undertook great risk in the course of litigation"); *Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 335 (N.D. Cal. 2014) (awarding $10,000); *Ontiveros v. Zamora*, 303 F.R.D. 356, 366 (E.D. Cal. 2014) ($15,000).

### d)  23(e)(2)(C)(iv): Identifying Agreements Under 23(e)(3)

Aside from the parties' recent stipulation regarding the amount of attorneys' fees, service awards, and expenses (described below), the parties confirm that to date there are no undisclosed side agreements pursuant to Rule 23(e)(3).  (Mot. at 16.)

### 3.    23(e)(2)(D): Proposal Treats Class Members Equitably Relative to Each Other

The Settlement Agreement also has terms and provisions that help ensure Class Members are treated equitably relative to each other and the damages they incurred because of defects in the Infotainment Systems.  Each Class Member will have a warranty automatically extended and may make use of it, provided they are still the current owners or lessees of the Class Vehicles.  But even those who are former owners are not left behind and may file a Claim for expenses incurred.  The Settlement also accounts for those that have made multiple trips to a dealership prior to the Notice Date to repair their Infotainment system issues, providing a HondaLink Security Service for free for two years.  Moreover, Class Members may also seek reimbursement for qualifying transportation costs and qualifying battery recharging costs incurred before the Notice Date.  (Settlement Agreement ¶ 3.)  The Settlement Agreement therefore strikes an appropriate balance among the various ways Class Members may have suffered because of the defects in the Infotainment Systems.

### 4.    Other *Churchill* Factors Indicate that the Settlement is Adequate, Reasonable, and Fair

As already discussed in analyzing the 23(e)(2)(C) factors, many of the *Churchill* factors indicate that the Settlement Agreement is fair, adequate, and reasonable because of the relative the strength of the plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; and the extent of discovery completed and the stage of proceedings.  The remaining *Churchill* factors, the experience and views of counsel and the reaction of the class members of the proposed settlement also support a finding that the Settlement is fair, adequate, and reasonable.

Courts within the Ninth Circuit give weight to the view of experienced counsel and the response of Class Members. *See, e.g., Nobles v. MBNA Corp.*, 2009 WL 1854965, at *2 (N.D. Cal. June 29, 2009); *Nat'l Rural Telecomms Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004). Class Counsel has extensive experience representing plaintiffs and classes in complex litigation, and Class Counsel unanimously support this Settlement. *Free Range Content, Inc. v. Google LLC*, 2019 WL 1299504, at *22 (N.D. Cal. Mar. 21, 2019) ("Class Counsel's views that the settlement is a good one is entitled to significant weight.") Class Members have generally reacted positively to the settlement. Out of approximately 450,000 Class Members, only 153 opted-out and only 4 objected. These figures provide powerful evidence of the Settlement's fairness. *See, e.g., Churchill Vill., L.L.C. v. GE*¸361 F.3d 566, 577 (9th Cir. 2004) (affirming approval of settlement with 45 objections and 500 opt-outs from a class of 90,000).

In sum, based on the Rule 23(e)(2) factors and the *Churchill* factors, the Court concludes that the Settlement is "fair, reasonable, and adequate." In the absence of any red flags of potential collusion, the Court declines to "unnecessarily meddle" in the Settlement negotiated by the parties. *Briseno*, 998 F.3d at 1027 (noting that courts have no "duty to maximize the settlement fund for class members").

//
//
//
//

## V.     CONCLUSION

For the foregoing reasons, the Court **GRANTS** certification of the class for settlement purposes and **GRANTS** final approval of the Settlement. The Court also **APPROVES** Class Counsels' request for attorneys' fees in the amount of $637,659.55, $28,845.45 in expense reimbursement, and $50,000 in service awards.

DATED:     January 4, 2022

_____

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE